299 F.2d 897
 PARTENWEEDEREI, MS BELGRANO, and Rudolph A. Oetker, Appellants,
v.
George WEIGEL, Appellee.
BRADY-HAMILTON STEVEDORE COMPANY, Appellant,
v.
PARTENWEEDEREI, MS BELGRANO and Rudolph A. Oetker, Appellees.
 No. 17178.
 United States Court of Appeals Ninth Circuit.
 Feb. 8, 1962.
 
 Gray, Fredrickson & Heath, Nathan J. Heath, Portland, Or., for appellant Brady-Hamilton.
 Wood, Wood, Tatum, Mosser & Brooke; Erskine B. Wood, Portland, Or., for appellant Partenweederei, Pozzi, Levin & Wilson, Frank Pozzi, Philip A. Levin, Portland, Or., for appellee Weigel.
 Before JERTBERG, KOELSCH and DUNIWAY, Circuit Judges.
 JERTBERG, Circuit Judge.
 
 
 1
 George Weigel, libelant below, and appellee here, hereinafter called 'libelant,' was an employee of Brady-Hamilton Stevedore Company, hereinafter called 'Stevedore,' and acting within the course and scope of his employment when he was struck by a boom of the vessel BELGRANO, as he was operating a tractor in reverse motion and pulling with a towline a railroad car, then loaded with lumber, upon a permanently fixed railroad spurline on the dock along shipside for the purpose of placing the limber under and within reach of the vessel's loading gear.
 
 
 2
 Libelant instituted his libel in admiralty, in rem against the vessel and in personam against its owner and operator, respondents below and appellants here, hereinafter collectively called 'respondents.' The respondents denied liability and impleaded Stevedore as third-party libelant under Admiralty Rule 56, 28 U.S.C.A in a cause of indemnity.
 
 
 3
 The question of the claim of respondents against Stevedore for indemnity was segregated and reserved until adjudication of libelant's claim against respondents.
 
 
 4
 Following trial on the segregated issue of liability on libelant's claim and the nature and extent of his damages, the District Court entered judgment in favor of libelant from which judgment respondents appeal.
 
 
 5
 Following trial on the segregated and reserved issue of indemnity, the District Court entered judgment to the full extent of libelant's judgment, in indemnity against Stevedore, from which judgment Stevedore appeals.
 
 
 6
 We will first consider respondents' appeal. The judgment in favor of libelant was based upon the findings and conclusions of the District Court that
 
 
 7
 (1) The vessel was unseaworthy in that her topping 'lift gear' for the starboard boom at No. 1 hatch malfunctioned and permitted the boom to fall upon the libelant because the pawls on the ratchet in the topping 'lift gear' were defective and inadequate in that they did not drop into each cog as the boom was hoisted so as to prevent the boom from falling, and that at the time of the accident libelant was engaged in performing a part of the ship's service as a longshoreman in the process of loading and storing her cargo;
 
 
 8
 (2) The respondents were negligent in:
 
 
 9
 (a) Failing to properly inspect the vessel and particularly the ratchet and pawl device to the hatch to determine the defective nature of same, since a reasonable inspection would have disclosed the malfunctioning of the pawls; and
 
 
 10
 (b) Failing to provide the libelant with a safe place to work.
 
 
 11
 The District Court further concluded that the unseaworthiness of the vessel and the concurring negligence of the respondents were the proximate causes of the falling of the boom and libelant's resultant injuries.
 
 
 12
 A detailed description of the mechanical features of the gear which operated the boom, the principles of its functioning while operating properly, the effects of its malfunctioning and the human and mechanical fectors which caused the boom to fall, would unduly and unnecessarily extend this opinion. For details concerning such matters, we refer the interested reader to the opinion of the District Court reported at 189 F.Supp., p. 103 (Apr. 14, 1960), which opinion also constitutes the findings of fact and conclusions of law of the District Court.
 
 
 13
 The facts surrounding the accident are stated in the opinion (189 F.Supp. p. 107), as follows:
 
 
 14
 'Immediately prior to the commencement of the operation leading up to the accident, the ratchet notches and the pawls were in a locked position and the lift gear was steady under the weight of the boom. The work of bringing aboard the lumber at No. 1 hatch required a topping of the boom in order to place the same in a working position, and the which driver called to a ship longshoreman and asked for 'a hand' in attaching the free end of the pigtail line to the gypsy head. The winch operator did not see this operation, and the longshoreman involved can give no satisfactory account of what he did in the way of fixing the free end of the pigtail line to the gypsy head. In any event, it was somehow attached, but evidently not properly. The which driver took up the slack in the pigtail line, put strain thereon, and commenced the lifting of the boom. The winch driver did not hear the 'clanking' of the pawls (dropping of the pawls in the notches in the ratchet rims). After raising the boom approximately three-four feet, the driver stopped the winch, braked it, and started astern to see what was wrong. Under the weight of the boom, the pigtail line started to slip on the gypsy head and the boom lift wire rope on the drum of the lift gear started to unwind. The boom in its fall gathered momentum, and the flailing free end of the pigtail line prevented the winch driver from manually putting stress upon the same. The boom, uncontrolled, fell to the starboard side of the vessel across the dock and struck the libelant. From the commencement of the raising of the boom, the unwinding of the drum, and throughout the fall of the boom, the pawls had failed to fall into the notches by gravity or otherwise.
 
 
 15
 'On the day before the accident, while in the process of topping the boom involved through the use of the life gear, the pawls had locked in an upright position and failed to properly function by falling under gravity into the locking position, and a longshoreman had used a piece of dunnage to strike and knock the pawls into position.'
 
 
 16
 Before considering the errors urged upon us by the respondents, we should state that respondents concede that the finding of fact of the District Court that the vessel was unseaworthy in that the pawls were stuck and failed to operate properly, is supported by ample evidence. Such finding is not challenged on this appeal by respondents or Stevedore.
 
 
 17
 Respondents' contentions are: (1) The District Court erred as a matter of law in concluding that libelant was entitled to the warranty of unseaworthiness; and (2) The conclusion of the District Court that the respondents were negligent in the respects above stated is without evidentiary support and clearly erroneous.
 
 
 18
 In holding that libelant was engaged in performing a part of the ship's service and therefore, entitled to the protection afforded seamen, the District Court relied squarely upon the opinion of this Court in Pope & Talbot, Inc. v. 'cordray, 258 F.2d 214 (9th Cir. 1958). In the Cordray case, a longshoreman was injured while the ship was at dock and engaged in discharging its cargo. The shipowner had contracts with two stevedoring companies in the cargo operation. The contract with one stevedoring company covered the operations pertaining to the discharge of cargo from the ship's hold to the ship's side at the dock. The contract with the other stevedoring company covered the operations pertaining to the moving of cargo from the ship's side to place of rest on the dock. Cordray was an employee of the second mentioned stevedoring company and was a foreman of the dock longshoremen. It was one of his duties to see that the cargo was moved to its first place of rest from the ship's tackle, and it was his duty also to coordinate the activities of the dock working longshoremen with those of the ship working longshoremen in order to have terminal employees and equipment available at the end of ship's tackle to keep the cargo moving. While most of the work of Cordray was done upon the dock, the evidence showed that Cordray was aboard the vessel at the time of his injury for the purpose of coordinating the cargo handling work of the dock longshoremen with that of the longshoremen working on the ship. The accident to Cordray happened when he went on board the ship to ascertain whether the gang of longshoremen on the ship were going to go home or shift to another hatch, so that Cordray could determine whether or not he would keep his dockside longshoremen available to continue the work. In the course of the opinion (258 F.2d pp. 217-18), this Court stated:
 
 
 19
 '(2) In the instant case the appellee, although performing most of his work on the dock in the moving of the ship's cargo from ship's tackle to its first place of rest (which was part of the ship's obligation), was on board the ship when the accident happened. Under the testimony, he was coordinating the unloading of the cargo from the ship's hold to its place of rest on the dock. We hold that the duty of providing a seaworthy ship and gear at the time of this accident extended to the appellee, whether or not appellee was on board the ship or on the dock. The test is, what was the nature of his work? He was performing a service for the ship in the discharge of its cargo. His employer was under contract with the shipowner to take the cargo from the shipside and to put it in a place of storage, and appellee was engaged in the performance of this work. The appellee's work was the work of a longshoreman and he was entitled to seaworthy gear while he was performing his services.'
 
 
 20
 During the trial of that case, counsel for the shipowner stipulated, '* * * that it is part of the obligation of the steamship company as carrier to not only raise the cargo out of the hold and land it on the dock, but also to place it in the warehouse.' Further, it appears in that case that each of the stevedoring companies had the right to use the ship's unloading gear and equipment and to go upon such places under the shipowner's control as were reasonably necessary in the performance by the employees of each stevedoring company of the work of discharging the cargo from vessel hold to point of rest on the dock floor within the dock warehouse.
 
 
 21
 It is clear under the facts of Cordray that it was the contractual obligation of the shipowner to move the cargo from the hold of the vessel to a place of rest on the pier along shipside but, additionally, to move the cargo to the dock warehouse. Cordray was on board the ship when injured performing his duty of coordinating the unloading of the cargo from the ship's hold to its place of rest on the dock. He was assisting in the unloading of the ship, which is the type of work traditionally performed by seamen. Clearly he was entitled to the protection afforded seamen. The statement in Cordray, '* * * that the duty of providing a seaworthy ship and gear at the time of this accident extended to the appellee, whether or not appellee was on board the ship or on the dock,' must be read in the light of the facts of that case. The Cordray opinion cannot be construed to extend to protection of the warranty of seaworthiness to any dock longshoreman whose injury results from unseaworthiness of a ship without regard to the type of work in which he is engaged.
 
 
 22
 Hence, unlike the facts in Cordray, the moving of the lumber from the dock to the vessel's loading gear was not part of the ship's service unless it can be said that the work of libelant was of the type traditionally performed by seamen.
 
 
 23
 In the instant case, the test of libelant's right to the protection of the warranty of seaworthiness is whether he was engaged in the type of work traditionally done by seamen. In United Pilots Ann. v. Halecki, 358 U.S. 613, 616-17, 79 S.Ct. 517, 519, 3 L.Ed.2d 541, the Supreme Court stated:
 
 
 24
 'The eventful development of the doctrine of unseaworthiness in this Court is familiar history. Although of dubious ancestry, the doctrine was born with The Osceola and emerged full-blown 40 years later in Mahnich v. Southern S.S. Co. (321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561) as an absolute and nondelegable duty which the owner of a vessel owes to the members of the crew who man her. The justification for this rigid standard was clearly stated in the Court's opinion in Mahnich:
 
 
 25
 "He (the seaman) is subject to the rigorous discipline of the sea, and all the conditions of his service constrain him to accept, without critical examination and without protest, working conditions and appliances as commanded by his superior officers.' 321 U.S. 96, at page 103 (64 S.Ct. 455, at page 459).
 
 
 26
 'With the nature of the duty thus defined, it remained for two other decisions of the Court to amplify its scope. Seas Shipping Co. v. Sieracki (328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099) and Pope & Talbot, Inc., v. Hawn (346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143) made clear that the shipowner could not escape liability for unseaworthiness by delegating to others work traditionally done by members of the crew. Whether their calling be labeled 'stevedore,' 'carpenter,' or something else, those who did the 'type of work' traditionally done by seamen, and were thus related to the ship in the same way as seamen 'who had been or who were about to go on a voyage,' were entitled to a seaworthy ship. See 346 U.S. at page 413 (74 S.Ct. at page 207).'
 
 
 27
 In the Halecki case, recovery under the doctrine of unseaworthiness was denied upon the ground that the work of the injured workman, who had gone aboard to clean the generators with carbon tetrachloride, was in no way the 'type of work' traditionally done by the ship's crew, and it was held that to extend liability for unseaworthiness to the decedent would 'distort the law of Mahnich, of Hawn and of Sieracki beyond recognition.'
 
 
 28
 The evidence of this case relating to the nature of libelant's work is not in dispute. The libelant was driving a tractor on the dock. His job was to push or pull railroad cars loaded with lumber up to a point on the spur track where the lumber could be reached by the ship's loading gear. He did not participate in loading the lumber onto the vessel or in stowing it. He had nothing to do with ship's tackle nor did his work require him to perform any service aboard the ship. His work was performed solely on the dock and in an operation preliminary to, but separate from, the work of loading the lumber onto the vessel. Although libelant's work brought him close enough to the vessel to be injured by the falling boom, liability arises not from the place of injury but from the nature of the work being performed.
 
 
 29
 Was the nature of libelant's work of the type traditionally performed by seamen? The only affirmative testimony in the record on the subject is uncontradicted expert testimony to the effect that libelant's work was not of the type traditionally performed by seamen. In our view, the District Court's reliance on Cordray was misplaced.
 
 
 30
 The burden of proof was upon libelant to show that he was entitled to the protection afforded seamen. In our view, he failed to do so. In so holding, we do not purport to lay down a fixed line of demarcation between 'seamen's work' and 'shoreside work.' Our holding is simply that the libelant failed to meet his burden of proving that the nature of the work performed by him was the 'type of work' traditionally performed by seamen.
 
 
 31
 We will now consider respondent's second contention that the finding and conclusion of the District Court with respect to negligence on the part of respondents is without evidentiary support.
 
 
 32
 The vessel was of German design, newly-built, engaged as a freighter, and appeared clean. The vessel's starboard boom at her No. 1 hatch was fitted with a topping 'lift gear' of German design, semi-automatic in operation, and a permanently affixed appurtenance of the vessel. The 'lift gear' was safe and in nowise an inherently dangerous appurtenance when functioning properly. The vessel had five hatches, each with at least two 'lift gears.'
 
 
 33
 The vessel had been to Vancouver, B.C. where it worked on October 6th and 7th prior to its arrival at Portland. The vessel arrived at Portland on the morning of October 9th. Early that morning, before the stevedores commenced working, the ship's crew used the topping 'lift gear' machinery to raise the booms, including the No. 1 starboard boom, from their cradles to a raised position so that they would be ready for use by the stevedores.
 
 
 34
 From then until the accident on the following day of October 10th, the booms remained raised. Later in the morning of October 9th, while the stevedores were changing the position of No. 1 starboard boom, they discovered that the pawls were stuck, and one of the stevedores used a board to pry them into place on the ratchet. This fact was never reported to any of the ship's officers or crew, although known to the stevedores' hatch boss. There is no evidence that any officer or member of the crew was aware of such malfunctioning. The 'lift gear' at No. 1 hatch was used throughout the rest of the day of October 9th. The accident occurred on the morning of October 10th, the circumstances of which have been previously detailed.
 
 
 35
 There is no evidence in the record of any foreign materials in and about the working elements of the ratchets, notches, pawls and the bearing of the pawl axle, nor physical damage of the working parts immediately prior to the accident, and the District Court so found. As to the cause of the malfunctioning, the District Court stated, 'The law of physics tells us that it is reasonable to infer that some abstract and necessarily patent binding force or strain among the working parts prevented a normal automatic mechanical action and function (dropping of the pawls by gravity) and thereby destroyed the usefulness and safety of the gear and rendered the same dangerous and unsafe.'
 
 
 36
 The fact that the vessel was found to be unseaworthy because the pawls in the 'lift gear' were defective and inadequate, does not establish negligence on the part of the respondents. The duty to furnish a seaworthy ship is absolute and non-delegable. It is a specie of liability without fault. Hence, the burden of proof rested with libelant to establish, by a preponderance of evidence, that negligence on the part of respondents was a proximate cause of libelant's injuries and damages.
 
 
 37
 The District Court concluded that respondents were negligent in failing to properly inspect the pawl and ratchet device to determine the defective nature of the same. It was libelant's burden to establish that respondents breached a duty owing to libelant. The District Court did not mention the nature of the duty owing by respondents to libelant, but we assume in light of the Court's finding that the breach consisted of the failure of respondents to properly inspect the pawl and ratchet device, that the duty owing by respondents was to make a reasonable inspection to see that the gear and equipment furnished by them operated properly.
 
 
 38
 There is no inteimation in the written opinion of the District Court that in reaching the conclusion of negligence, the Court relied in any way upon the doctrine of res ipsa loquitur, nor does libelant make any such contention on his appeal. Hence, negligence cannot be inferred from the mere happening of the accident, nor does the accident establish a prima facie case of negligence on the part of the respondents. Notwithstanding proof of the happening of the accident, the full burden of proof of negligence remained on the libelant.
 
 
 39
 Proof offered by the respondents, which we do not detail in this opinion, is of no help to libelant since all such proof tended to establish that the vessel's gear and equipment were functioning normally and properly when the stevedores took over the cargo loading operations. Libelant argues that the trial judge was not required to accept such testimony in view of the happening of the accident and the discovery by the stevedores, shortly after they commenced their cargo loading operations, of the malfunctioning of the pawl and ratchet device. We agree. However, disbelief by the Court of such proof does not establish a breach of respondents' duty to make a reasonable inspection to see that the gear and equipment furnished for the cargo loading was in good condition and operating normally. The burden of proof was upon the libelant to establish negligence and not upon respondents to establish freedom from negligence.
 
 
 40
 What did libelant establish? He established: (1) That the accident occurred; (2) That it occurred because of the malfunctioning of the pawl and rachet device; and (3) That the stevedores discovered the malfunctioning of the device shortly after cargo loading operations commenced on the day before the accident. From these facts, libelant contends that the District Court properly inferred that a reasonable inspection by respondents would have revealed the cause of the malfunctioning. The vice of that argument is the absence from the record of any testimony establishing, or tending to establish, the standard of conduct which respondents were required to meet in discharge of their duty to make a reasonable inspection to see that the gear and equipment furnished by them operated properly. There is no testimony in the record of what conduct on the part of operators and owners of vessels of the type or similar to the type of the BELGRANO and similarly equipped, was usual or customary or required by good practice or by law or regulation in making inspection of gear and equipment. Is the standard of conduct met by a visual inspection of the gear and equipment? Does the standard of conduct require an operational test of the gear and equipment of a vessel? Does the standard of conduct require constant inspection? Does the standard of conduct require daily inspection? Does the standard of conduct require inspection before and after each use of the gear and equipment? The record leaves us completely in the dark in attempting to find answers to these questions.
 
 
 41
 On the record in this case, we ard constrained to hold that the libelant failed to meet the burden of proof resting upon him of establishing negligence on the part of the respondents.
 
 
 42
 The District Court also concluded that the respondents were negligent in failing to furnish libelant with a safe place to work. This point is not mentioned in any of the several briefs which have been filed. There is no evidence in the record that the respondents furnished or were in any way obliged to furnish to libelant the place to work where he was working. The District Court's conclusion of negligence on this point is wholly unsupported.
 
 
 43
 The judgment and decree from which respondents appeal is reversed.
 
 
 44
 This disposition of the case makes it unnecessary to consider the question of indemnity since the decree of indemnity rests upon the judgment and decree which is reversed by this opinion. The decree of indemnity is likewise reversed.