George **GARRETT**, Plaintiff,

v.

Enso **GUTZEIT O/Y**, Defendant and Third-Party Plaintiff,

v.

**TIDEWATER STEVEDORING CORPO-RATION**, Third-Party Defendant.

**Civ. A. No. 75-71-NN.**

United States District Court,
E. D. Virginia,
Newport News Division.

Jan. 10, 1973.

Sidney H. Kelsey, Norfolk, Va., for plaintiff.

Charles F. Tucker, Norfolk, Va., for defendant.

L. Shields Parsons, Jr., Norfolk, Va., for third-party defendant.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

This case assumes the posture typical to cases of injuries sustained by a longshoreman. George Garrett, a longshoreman, filed this action against the shipowner, Enso Gutzeit O/Y, alleging the latter's negligence and a breach of its warranty of seaworthiness. The defendant filed a third-party complaint against Tidewater Stevedoring Corporation, Garrett's employer, for allegedly breaching the duty of workmanlike service which it owed the shipowner. Jurisdiction of this court to determine the issues presented, while in dispute, is founded on 28 U.S.C. § 1332.

The accident in question occurred the morning of January 7, 1971, in a shed on Pier B belonging to the Chesapeake and Ohio Railroad. Garrett was a member of a longshore gang ordered in connection with the discharge of cargo from the hold of the Finnish ship S.S. Finnclipper owned and operated by the defendant. In accordance with customary procedure, upon arrival the gang was divided into a "ship's gang" and a "dock gang." From eight o'clock, when work commenced, until eleven-thirty, the time of the accident, the plaintiff was assigned to stow cargo in the shed which was some twenty-five feet or more from the side of the vessel. He had not been aboard the ship that morning, nor had he come in contact with any of the ship's equipment.

The cargo consisted of bales of pulp paper which measured approximately 2½ feet by 2½ feet by 1½ feet and weighed some three to five hundred pounds. Each bale was compressed and held together by four wire bands, two of which were wound in each direction.

The method of discharge was an "end of tackle discharge;" this being the usual procedure for cargo of this type. Lowered into the hold by the ship's gear was a metal ring from which was suspended eight to ten sets of lines ending in metal hooks. Each set of hooks was utilized with one bale, one hook being placed in the juncture of two wire bands on each side. In unloading, the draft, limited to eight bales in this particular instance, would be lifted and set down on the dock at which time the bales would be disconnected from the fall. Members of the dock gang would then move the bales one at a time by means of a hand truck to the shed where they were unloaded and then stacked four high. This operation was described by several witnesses as a continuous operation.

The accident occurred while the four men were "jumping" a bale up to the fourth row. The bale itself had two bands missing, so all four longshoremen had their hand hooks in the two remaining bands. After the bale had been lifted from the floor, the band held by Garrett's hook broke, causing the bale to twist toward him. The plaintiff's hook caught in the paper and, being unable to free it, he was pinned under the bale. There was medical testimony indicating a herniated disc in Garrett's spine, which subsequently required surgery in August 1971.

The threshold issue goes to the jurisdiction of this court to apply the general maritime law. The defendant argues because the accident occurred on a pier, at least twenty-five feet from the side of the ship, and the instrumentality was neither connected to nor part of the ship's equipment, that no jurisdiction exists. The resolution of this problem lies in a close reading of the two Supreme Court cases in the area. Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963) and Victory Carriers, Inc. v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L. Ed.2d 383 (1971).

*Gutierrez* interprets the Extension of Admiralty Jurisdiction Act,

46 U.S.C. § 740, and holds it unnecessary for the ship itself to be the instrumentality of the injury. The test established was if the shipowner commits a tort during or before the unloading, and the impact is felt ashore at a time and place not too remote from the wrongful act, the case falls within general maritime jurisdiction, 373 U.S. at 210, 83 S. Ct. 1185. The lower courts liberally construed this decision and began applying the admiralty rules of law to most shoreside accidents involving longshoremen. The Supreme Court severely curtailed this trend in the *Victory Carriers* case. By way of clarification of the *Gutierrez* test, the court held that the accident must either occur on the ship itself or, if the impact is on land, be caused by the vessel or an appurtenance thereto. *See* 404 U.S. N.14, at 214, 92 S.Ct. 418. However, there is no indication that *Gutierrez* was intended to be overruled. Thus it must be assumed the "time and place" limitations are also still binding.

■■ We have little difficulty finding, on these facts, the existence of admiralty jurisdiction. The instrumentality of the injury was cargo which had been stored aboard the defendant's vessel. Having accepted the cargo, the shipowner becomes responsible for any injury caused by a defective condition of the cargo container, whether the impact is felt aboard the vessel or on the dock. *Gutierrez*, 373 U.S. at 215, 83 S.Ct. 1185. Cargo coming from the vessel's hold satisfies the "appurtenance" requirement of *Victory Carriers*. Since this accident occurred no more than fifty feet or so from the vessel's side and during a continuous operation, we must find the "time and space" requirements of *Gutierrez* satisfied. Also, for these reasons, admiralty jurisdiction exists and general maritime law is controlling.

Due to a lack of evidence at trial, the issue of negligence was taken away from the jury and the case was submitted solely on unseaworthiness. Since admiralty jurisdiction did exist, this uniquely maritime theory of recovery would be cognizable in the proper case. The inquiry now must focus upon whether this was in fact a proper case to send to the jury on unseaworthiness.

■ The warranty that the ship is seaworthy is not made to everyone who may come within the jurisdiction of admiralty. While initially only seamen were benefited by the doctrine, its coverage has been expanded to protect certain longshoremen. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

■■ Garrett, a longshoreman, cannot, as a matter of law, be treated as a member of the ship's crew in all considerations, but he is offered comparable protection while he is performing the traditional duties of the seaman. *See* Giddens v. Isbrandtsen Co., 355 F.2d 125, 127 (4 Cir., 1966). Since it was incumbent upon the shore-based plaintiff to prove that he was a member of the limited class to whom the warranty of seaworthiness runs, McCown v. Humble Oil & Refining Company, 405 F.2d 596 (4 Cir., 1969), we must examine the record to determine if sufficient evidence has been produced and, therefore, whether it was proper to submit the case to the jury.

■ While there is great controversy as to the scope of "traditional work of seamen," it is generally recognized that the court must look to the nature of work performed, its relationship to the ship, and historic doctrines to make this determination. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953). Some courts have expressed the view that a longshoreman who is engaged in loading or unloading a ship is doing seaman's work *as a matter of law*. *See* McNeil v. A/S HAVBOR, 326 F.Supp. 226 (E.D.Tenn., 1971). This court is inclined to agree with this statement. The difficulty arises with attempts to ascertain where loading and unloading in fact begins and ends.

*Victory Carriers* recognizes the hopelessly irreconcilable holdings of the lower courts as to when loading commences

and ceases. While the Supreme Court scoffed at the attempts to delineate loading and unloading, the only issue with which the court dealt was the existence of admiralty jurisdiction. We do not dispute the fact that whether or not a longshoreman was loading or unloading some vessel is an irrelevant consideration to the jurisdictional issue. But once the maritime law is found to be applicable, we do not believe that *Victory Carriers* intended to overrule the *Sieracki* decision as to whom the duty of seaworthiness is applicable. As to land-based workers, *Victory Carriers* did not intend to extend the protection of seaworthiness to all who merely come within maritime jurisdiction. Thus a decision as to the "loading and unloading" issue may be essential in determining whether the longshoreman was, in fact, doing the work traditionally done by seamen.

There are basically two schools of thought as to the proper definition of loading. The more liberal view refuses to use the word as one of art and does not narrowly and hypertechnically interpret it. *See* Litwinowicz v. Weyerhaeuser Steamship Company, 179 F.Supp. 812 (E.D.Penn., 1959). Their definitions range from "an integral part of the unloading," Hagans v. Ellerman & Bucknall Steamship Company, 318 F.2d 563 (3 Cir., 1963); to "direct and necessary step in the loading operation," McNeil v. A/S HAVBOR, *supra*; to "an essential part of unbroken sequence of moving [cargo] from the pier to the ship," Chagois v. Lykes Bros. Steamship Company, 432 F.2d 388 (5 Cir., 1970). It is interesting to note that these broad definitions of loading and unloading were developed immediately after-*Gutierrez*. It is very likely these courts were influenced by what they interpreted as the Supreme Court's mandate to extend the warranty of seaworthiness shorewards. In light of the limitations imposed by *Victory Carriers,* we feel justified in reaffirming our previous views with respect to unloading. See Drumgold v. Plovba, 260 F.Supp. 983 (E.D.Va., 1966).[1]

 Adherence to this restrictive definition of unloading dictates a finding that the unloading process had ceased before Garrett performed his stacking services in the warehouse. This finding does not of itself preclude the applicability of the seaworthiness doctrine to the plaintiff, merely a holding that Garrett was, as a matter of law, within the *Sieracki* doctrine. *See* Hagans v. Ellerman & Bucknall Steamship Co., 318 F.2d 563 (3 Cir., 1963). The question remains open as to whether a seaman's work extends beyond the actual unloading. While a longshoreman as far removed from the ship as stacking cargo in a warehouse on the pier is not excluded from recovery as a matter of law; *see* Pope & Talbot, Inc. v. Cordray, 258 F.2d 214 (9 Cir., 1958); Valerio v. American President Lines, 112 F.Supp. 202 (S.D.N.Y., 1952), *but see* Young v. Chevron Oil Company, 314 F. Supp. 1278 (E.D.La., 1970), he must persuade the trier of fact by a preponderance of the evidence or fail, *see* Par-

[1]. It is interesting to note that the forerunner of Victory Carriers, Inc. v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971) is Law v. Victory Carriers, Inc., 432 F.2d 376 (5 Cir., 1970), which was reversed by the Supreme Court. In the opinion of the Fifth Circuit the major discussion centered around Drumgold v. Plovba, 260 F.Supp. 983 (E.D.Va., 1966). See 432 F.2d at 380–382, where the Fifth Circuit disagreed with Drumgold. The reversal of the Fifth Circuit by the Supreme Court was grounded upon a jurisdictional question and, as to this issue, it is apparent that we are not concerned with when loading commences or when unloading ceases. Nevertheless, as we now consider same, it does become an important factor in determining whether a longshoreman is doing the traditional work of a seaman. As the Supreme Court said in Victory Carriers v. Law (404 U.S. at 211, 92 S.Ct. at 424):

"The Court has never approved an unseaworthiness recovery for an injury sustained on land merely because the injured longshoreman was engaged in the process of 'loading' or 'unloading.'"

See also n. 14 in Victory Carriers v. Law.

tenweederei, M/S Belgrano v. Weigel, 299 F.2d 897 (9 Cir., 1962); Daniel v. Skibs A/S Hilda Knudsen, 253 F.Supp. 758 (E.D.Pa., 1966).

The award of damages in this case cannot stand as the question of the work traditionally done by a seaman was never submitted to the jury. Upon reading the court's charge, the jury could fairly assume, if the question was raised at all, that Garrett was in fact to be considered a seaman. Not only was there no objection raised to that portion of the charge as given but also it was error to submit the issue to the jury since the record is devoid of sufficient evidence upon which reasonable men could decide this issue. The only shred of evidence in the plaintiff's favor was a statement that the longshoremen were paid by the shipowner to stack the cargo,[2] but in the same breath the witness insisted that the cargo was the complete responsibility of the longshoremen and C & O, the pier owner, after the cargo hit the dock. The mere payment for a service by a shipowner does not constitute sufficient evidence to go to the jury as there are many services for which a shipowner contracts which are out of the scope of a seaman's work. The record should contain some affirmative evidence that the job being performed was in fact the traditional work of a seaman, see Royston v. Pacific Far East Lines, Inc., 190 F.Supp. 450 (N.D. Cal., 1960). From the evidence presented this court must say that Garrett "was not doing what any crew member had ever done on this ship or anywhere else in the world so far as we are informed." United Pilots Assn. v. Halecki, 358 U.S. 613, 618, 79 S.Ct. 517, 519, 3 L.Ed.2d 541.

The defendant contends that judgment should be entered notwithstanding the verdict because there was insufficient evidence to warrant submission of the issue of an unseaworthy condition to the jury. It is argued that the dearth of evidence regarding the band that broke was such as to cause the jury to indulge in speculation, which is not allowable. Swords v. American Sealanes, Inc., 443 F.2d 1324 (4 Cir., 1971). While it is true there was no direct evidence that *this particular band* was defective, such evidence for the most part being unobtainable is not required. Inspection of the record reveals sufficient circumstantial evidence that the band in question was not fit for its intended purpose. There was testimony that many bands had broken that morning and that two bands were missing from this particular bale. The evidence revealed that once bands were lost, due to the internal pressure of the bale, the stress on the remaining bands was greatly increased, and in recognition of which there was a rule that bales with less than three bands must be set aside and not stacked.

Having denied recovery to the plaintiff, the question concerning the shipowner's identification by the stevedores has been mooted except for the question of counsel fees and costs which will be reserved.

Counsel for the shipowner will prepare an order setting aside the verdict of the jury and entering judgment for the defendant on the claim of the plaintiff. In the absence of agreement, the remaining portion of the controversy between the shipowner and stevedore will be reserved.

---

**2.** While the stevedore's contract with the shipowner does include compensation for placing the cargo in the shed, the longshoremen are at all times employees of the stevedore and, of course, the overall cost is borne by the shipper or consignee according to their agreement. In any event the only compensation available as of right is pursuant to the Longshoremen's and Harbor Workers' Act or the state Workmen's Compensation Act, dependent upon the circumstances. Unseaworthiness is not a factor in such a situation.