Dorothy J. METZGER, surviving wife of William Frederick Metzger, deceased, individually and for the use of Ronald Lee Metzger and Howard Bruce Metzger, surviving infant children of William Frederick Metzger, deceased

v.

S. S. KIRSTEN TORM, her engines, tackle, apparel and furniture, and Torm Line.

Adm. No. 4419.

United States District Court
D. Maryland.

July 8, 1965.

Supplemental Opinion Sept. 24, 1965.

Fred Ginsberg and Eugene V. Chircus, Baltimore, Md., for libelant.

David R. Owen and Semmes, Bowen & Semmes, Baltimore, Md., for respondent.

THOMSEN, Chief Judge.

This is a suit in admiralty to recover damages for the death of a longshoreman, who was killed while working on board the S.S. Kirsten Torm, while it was moored to a pier in Baltimore Harbor.[1] The issues require construction of the Maryland "Lord Campbell's Act", Anno.Code of Md., 1957 ed., Art. 67, secs. 1–6, with respect to liability thereunder for unseaworthiness and negligence, the persons who may recover, and the amount of any such recovery.

William F. Metzger, the decedent, was a longshoreman who, on September 24, 1962, was employed by Jarka Corporation of Baltimore, a stevedoring company, to assist in loading steel billets into the No. 4 lower hold of the S.S. Kirsten Torm, which was moored to the Pennsylvania Railroad pier. While Metzger was working in the hold a wire rope sling, attached to a draft of billets being lowered into the hold, parted, causing the steel billets to fall and strike him. The sling was owned by Jarka, and was attached to a hook at the end of the runner of a crane, which was owned and operated by the Railroad Company. The runner and hook were part of the crane, which moved along the pier on rails.

The draft consisted of 33 steel billets, each of which was 30 ft. long and 2½ inches square. Each billet weighed 600 lbs., making the total weight of the draft 19,800 lbs. Two slings had been attached to the draft by longshoremen, employed by Jarka, in a railroad car on the apron of the pier. The sling which parted had been attached at a point about

---

1. The suit is in rem against the vessel, and is being defended by Dampskilsselskabet Torm A/S, owner and claimant of the vessel. A claim in personam against the owner was included in the libel, but the owner was never served with process.

10 ft. from one end of the draft, while the other sling was attached about 5 ft. from the other end. The slings were attached at uneven distances from the ends so that one end of the draft would be a little higher than the other while it was being lowered into the hold. This was necessary because the billets were longer than the open hatch. Each sling was 6–37 wire cable, fibre core, ¾ inch diameter, improved plow steel, 25 ft. long overall, with eyes at both ends.[2] After one end of the sling was wrapped around the draft, the eye at that end was fastened to a pedro hook, which traveled along the standing part of the sling, and held the loop tightly around the draft. The eye at the other end of each sling was then attached to the hook at the end of the runner, and the crane raised the draft from the car and lowered it into the hold. After a draft was landed in the hold, the sling would be unwrapped by the longshoremen there and raised out of the hold by the crane.

When the draft involved in the accident neared the bottom of the hold, the forward sling parted. Almost immediately thereafter the rear sling also parted, and the billets fell, striking and killing Metzger. The draft did not hit any part of the ship or any other object before the slings broke. The draft was being lowered smoothly and steadily, there was no jerk before the break, and the billets did not slip in the loops of the slings at any time.

Twenty-three drafts had been loaded without incident during a period of an hour and a half that morning; the sling which parted had been used on eleven of them. The slings were new, without any apparent defect. The longshoremen noticed no more flattening of the cables than would be expected when slings are used with pedro hooks. The expert who examined the slings macroscopically found a little more flattening than usual, but not an excessive amount. The microscopic examination showed some structures which should not be present in sound wire, although the expert could not say just what the structures were. He did say and the Court finds that the condition could not have been caused by the loading of a single billet. The number of microscopic cracks which were discovered indicated that the material was more brittle than ordinary wire. The break occurred in the area where the sling passed through the eye of the pedro hook, not in the spliced eye of the sling.

Most importantly, 6–37 wire cable with fibre core, ¾ inch diameter, improved plow steel, has a breaking strength of 45,200 lbs. The load on the lower sling was slightly over 14,000 lbs. Both the agreed custom of the industry and the Safety and Health Regulations for Longshoring, June 1960, published by the United States Department of Labor, Bureau of Labor Standards, Division of Safety, § 9.62, require a safety factor of 5 to 1. The ¾ inch diameter wire cable with fibre core was not safe for this type of operation, in view of the weight of the draft and the use of the pedro hook. A stronger cable should have been used. Jarka did not exercise reasonable care in using the ¾ inch sling. The issues in this case, however, are whether under all the circumstances the use of the sling by Jarka rendered the ship unseaworthy under the applicable law and whether there was any negligence on the part of the master or crew of the ship which caused or contributed to the injury.

The shore based crane was being used for the loading because the weight of the drafts was far beyond the capacity of the ship's booms. The slings were supplied by Jarka; the ship did not carry any slings suitable for such loading operations. None of the gear was attached to any part of the ship in any way. The Chief Officer of the Kirsten Torm testified that he always keeps an eye on the gear the stevedores are using "to see if it looks good or not"; if something is

2. 6–37 means that each sling was comprised of 6 strands, each strand containing about 37 wires.

wrong with the gear, "we tell the stevedores and they change", but this morning "it looked nice, * * * it was new wire they were using". It was the type of gear always used in America. The Chief Officer looked into the hold several times before the accident. The Third Officer saw the draft in question when it was just over the hatch; he saw nothing unusual about it; he had observed the loading operations and did not see anything wrong. Neither officer questioned anyone about the strength of the cable or the crane.

The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959), and United New York & New Jersey Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959), as interpreted by a majority of the Supreme Court in Goett v. Union Carbide Corp., 361 U.S. 340, 80 S.Ct. 357, 4 L.Ed.2d 341 (1960), and in Hess v. United States, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960), held that "in an action for wrongful death in state territorial waters the conduct said to give rise to liability is to be measured not under admiralty's standards * * * but under the substantive standards of the state law." 361 U.S. at 319, 80 S.Ct. at 345. "Under this holding, in a maritime tort death case, the State might apply the substantive law generally applicable to wrongful death cases within its territory, or it might choose to incorporate the general maritime law's concepts of unseaworthiness or negligence." 361 U.S. at 342, 80 S.Ct. at 358.[3] See also Union Carbide Corp. v. Goett, 4 Cir., 278 F.2d 319 (1960).

The basic questions, therefore, are: (1) whether the Maryland "Lord Campbell's Act", Anno.Code of Md., 1957 ed., Art. 67, secs. 1–6,[4] employs the Maryland or the general maritime law concept of negligence; (2) whether the Maryland Act encompasses a suit in admiralty for death caused by the unseaworthiness of a vessel; and if so (3) whether Maryland would apply the concepts of unseaworthiness developed by the Supreme Court in longshoremen's cases or some other standards and principles.

There is no Maryland case in point on any of the questions. In cases within the maritime jurisdiction involving injuries to longshoremen, not resulting in death, the Court of Appeals of Maryland has applied, as it must, the concepts of unseaworthiness and negligence developed by the Supreme Court. Frazier v. Waterman S.S. Corp., 206 Md. 434, 112 A.2d 221 (1955). But it has not yet had to consider any civil action for the death of a longshoreman.

In 1959, after Skovgaard and Halecki, but before Hess and Goett were decided by the Supreme Court, and before the decision of the Fourth Circuit on remand of Goett, this Court overruled motions to dismiss two civil actions in each of which the complaint charged that the death of a longshoreman was caused by the unseaworthiness of the vessel on which he was working. State v. Weyerhaeuser Steamship Co., D.Md., 176 F.Supp. 664 (1959); State v. Nabella, D.Md., 176 F.Supp. 668 (1959). The discussions in those opinions will not be repeated here; they should be read as part of this opinion. Suffice it to say that after full consideration[5] this Court

---

3. Whether the Supreme Court will adhere to that rule may be debatable, see 278 F. 2d at 320–321, but the statements quoted above are binding on this Court until they are overruled.

4. It should be noted that sec. 1 of the Maryland Act was amended in 1949 to impose liability in rem on a vessel for a "wrongful act, neglect or default" which causes the death of a person under circumstances where the vessel would have

been liable to the person injured if he had survived.

5. This Court considered, inter alia, the opinions of the several Courts of Appeals, as well as of the Supreme Court in Skovgaard and Halecki, of the Fourth Circuit in Holley v. The S.S. Manfred Stansfield, 269 F.2d 317 (1959), of Judge Chesnut in A/S Nye Kristianborg, D.Md., 84 F.Supp. 775 (1949), and of the Court of Appeals of Maryland in Demczuk v.

concluded that the Court of Appeals of Maryland would hold that the Maryland statute is not limited to the wrongful acts, neglects and defaults with which the legislators who adopted it were familiar, but that the statute was intended to apply to all wrongful acts, neglects and defaults which from time to time would entitle the party injured to maintain an action; and that in view of the onerous duties placed on the shipowner by Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954), the Maryland Court would hold, however reluctantly, that the failure of a shipowner to provide a seaworthy ship, with appurtenant appliances and equipment, is a "wrongful act, neglect or default" within the meaning of the Maryland statute. See State v. Nabella, 176 F.Supp. at 671.

In the opinion on remand, Union Carbide Corporation v. Goett, 4 Cir., 278 F.2d 319 (1960), cert. den. 364 U.S. 826, 81 S.Ct. 64, 5 L.Ed.2d 55 (1960), after concluding that in a maritime tort death case West Virginia would choose to adopt the general maritime law's concepts of unseaworthiness or negligence, the Court said:

"Although we have concluded that the Supreme Court of West Virginia would apply maritime law concepts of negligence in such a case as this, we do not believe that it would run ahead of the federal courts and create duties not heretofore recognized or enforced by the Supreme Court of the United States or by the weight of other federal authority, and not applied by West Virginia courts in analogous situations." 278 F.2d at 322.

This Court believes that the foregoing quotation states the attitude which would probably be taken by the Maryland Court on the issues of unseaworthiness and negligence presented by the case at bar.

It is too late for a state court or an inferior federal court to challenge the logical justification for the decisions in Sieracki and Petterson. The last knight errant, champion of a careful reading of precedents, Judge Calvert Magruder, was dispatched by the majority of the Supreme Court in Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960), with Mr. Justice Frankfurter, Mr. Justice Harlan and Mr. Justice Whitaker the only mourners. But it does not necessarily follow that the Maryand Court would extend the concept of unseaworthiness so far as to impose liability on the ship in this case or would find negligence on the part of the ship's officers.

 First, with respect to negligence. The test is whether the ship's officers exercised that degree of care which reasonably prudent persons in their position customarily exercise or are required to exercise in similar circumstances. A competent and experienced stevedoring company had been engaged; the equipment appeared to be that customarily used on this side of the Atlantic; and the slings looked new. Ordinary care did not require the ship's officers to inspect every piece of equipment and material supplied by the stevedore for use in the loading operation. The officers were not required to examine and measure each sling and determine its breaking strength. The loading of the previous drafts over a period of two hours or so had given no indication that any of the equipment was defective or inadequate. A Maryland Court would not be required by any Supreme Court decision or the weight of other federal authority to apply a standard which would result in a finding of negligence on the part of the ship. This Court is satisfied that the Maryland Court would not do so.

Jenifer, 138 Md. 488, 114 A. 471 (1921), State, to use of Dunnigan v. Cobourn, 171 Md. 23, 187 A. 881, 107 A.L.R. 1045 (1936), and McKeon v. State, to use of Conrad, 211 Md. 437, 127 A.2d 635 (1956).

The issue of unseaworthiness presents a more difficult problem. The sling was not part of the ship's gear or tackle; nor was it attached to the ship or to any of the ship's gear, as was the snatch block in Alaska S.S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954). The question is whether the sling was an "appurtenance" of the ship.

Similar or analogous situations have been considered by a number of courts. Where the defective equipment was shore based, was not incorporated into or integrated with any part of the ship or its equipment, and was not such equipment as is generally carried on a ship, the district courts have uniformly held that the crane, marine leg, or other equipment did not become an appurtenance of the ship, even though it was handled by the longshoremen in the course of the loading operations, in some instances on board the ship, in other instances on the pier. McKnight v. N. M. Paterson & Sons, Ltd., N.D.Ohio, 181 F.Supp. 434 (1960), affirmed 6 Cir., 286 F.2d 250 (1960), cert. den. 368 U.S. 913, 82 S.Ct. 189, 7 L.Ed.2d 130 (1961); Sherbin v. S. G. Embiricos, Ltd., E.D. La., 200 F.Supp. 874 (1962); Deffes v. Federal Barge Lines, Inc., E.D.La., 229 F.Supp. 719 (1964); Cockrell v. A. L. Mechling Barge Lines, Inc., S.D.Tex., 192 F.Supp. 622 (1961); Miller v. The Transandina, S.D.Cal., 1964 A.M.C. 1159, and the decisions of the district courts in Forkin, Huff and Spann discussed below.

In McKnight, supra, the Sixth Circuit affirmed per curiam the decision of the district court denying liability. In Forkin v. Furness Withy & Co., 2 Cir., 323 F.2d 638, 641 (1963), the majority opinion by Judge Friendly, in which Chief Judge Lumbard concurred, held that "[e]quipment maintained on a pier to establish connection with a ship is not an 'appliance appurtenant to the ship' or part of the ship's 'gear,' at least until it has been affixed," and that a defect in such equipment is not within the shipowner's warranty of seaworthiness. In the instant case the sling did not remain on the pier, but was lifted over the side of the ship and lowered into the hold, where it was to be removed from the draft by the longshoremen working there.

In Huff v. Matson Navigation Company, 9 Cir., 338 F.2d 205 (1964), cert. den. 380 U.S. 943, 85 S.Ct. 1026, 13 L.Ed. 2d 963 (1965), a longshoreman in the hold of a vessel was injured because of a defect in a conveyor system which was attached to a gantry crane running on rails along the pier, which was owned by the stevedoring company. Ropes or falls ran through blocks from the conveyor to the sides of the ship's hold. The Ninth Circuit held that the ship was unseaworthy, relying heavily on the following statement from Italia Soc., etc. v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964), which was decided after the decision in Forkin: "The shipowner is liable for unseaworthiness, regardless of negligence, whenever the ship or its gear is not reasonably fit for the purpose for which it was intended and this liability extends to longshoremen and others who work aboard the vessel, including those in the employ of contracting stevedore companies. Seas Shipping Co. v. Sieracki, 328 U.S. 85 [66 S.Ct. 872, 90 L.Ed. 1099]; Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Mitchell v. Trawler Racer, Inc., 362 U.S. 539 [80 S.Ct. 926, 4 L.Ed.2d 941]. If the owner engages others who supply the equipment necessary for stevedoring operations, he must still answer to the longshoreman if the gear proves to be unseaworthy. Alaska S. S. Co. v. Petterson, 347 U.S. 396 [74 S.Ct. 601, 98 L.Ed. 798]. This liability is strict and nondelegable. Mitchell v. Trawler Racer, Inc., supra; Mahnich v. Southern S.S. Co., 321 U.S. 96 [64 S.Ct. 455]." 376 U.S. at 317, 84 S.Ct. at 750. The Ninth Circuit added: "Particularly noteworthy is the next to last sentence in that quotation which makes it plain that the shipowner's obligation of seaworthiness extends to all equipment for loading or

unloading supplied by the stevedoring contractor." 338 F.2d at 210.

The Third Circuit has followed the Ninth Circuit in allowing recovery based on unseaworthiness in an analogous situation. Spann v. Lauritzen, 3 Cir., 344 F.2d 204 (1965).

■ Although the reasoning of Judge Friendly in Forkin is persuasive, this Court concludes, in view of the statement of the Supreme Court in Italia and the subsequent decisions of the Ninth and Third Circuits in Huff and Spann, that the weight of federal authority requires a finding that the sling had become an appurtenance of the ship, that the ship was unseaworthy, and that a Maryland court would so hold.

The issue of damages is not free from difficulty. Metzger was born in February 1915. He had been married three times: first, in June 1934 to Nora Laura Jenkins, from whom he was divorced in April 1939; again, in September 1947 to Minta Marie Gifford, from whom he was divorced in May 1958; finally, in July 1958 to libelant, his widow.

Libelant was born in September 1926. She had married Dorwin Poling in April 1949 and was divorced from him in August 1956. The two children who are named as use-libelants, Ronald Lee Metzger and Howard Bruce Metzger, were born to her in March 1956 and March 1957 respectively. It appears, therefore, that Ronald was born and Howard was conceived while libelant was married to Poling, and both were born before her marriage to Metzger.

■ Libelant seeks to prove by her own testimony, which was admitted subject to exception, that both children were in fact Metzger's children and that she had separated from Poling in August 1954. There was no other proof of these facts. Under Maryland law non-access by the then husband must be shown by evidence other than the testimony of the wife; her testimony on that point is not admissible. Scanlon v. Walsh, 81 Md. 118, 31 A. 498 (1895); Harward v. Harward, 173 Md. 339, 196 A. 318 (1937); Hall v. State, 176 Md. 488, 5 A.2d 916 (1939); Dayhoff v. State, 206 Md. 25, 109 A.2d 760 (1954); Hemenway v. Towner, 1 Allen (Mass.) 209, cited with approval in Scanlon v. Walsh, 81 Md. at p. 131, 31 A. 498. In the instant case there was no proof of non-access. Both Ronald and Howard, therefore, must be considered the children of Poling, and as such not entitled to share in any recovery for the death of Metzger under the terms of the Maryland Lord Campbell's Act. Art. 67, sec. 4; State To Use of Holt v. Try, Inc., 220 Md. 270, 152 A.2d 126, 72 A.L.R.2d 1232 (1959).

In Taylor v. State, 233 Md. 406, 197 A.2d 116, where illegitimate children had received an award under the Maryland Workmen's Compensation Act, Code Art. 101, for the death of their putative father, and a third-party action had been brought under sec. 58 of that Act and under Art. 67, the Maryland Lord Campbell's Act, the Court of Appeals of Maryland held that the two acts are in pari materia, and must be construed together. The Court therefore included the illegitimate children who had received the award among those entitled to recover damages in the third-party action.

■■ In the instant case, however compensation was awarded under an Act of Congress, the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., and not under the Maryland Workmen's Compensation Act. Ordinarily, statutes passed by the legislatures of different sovereignties are not considered in pari materia. There is nothing in the two statutes involved in this case to require a different conclusion. An analogous situation is discussed in Holley v. The S.S. Manfred Stansfield, E.D.Va., 186 F.Supp. 805, 808 (1960). Moreover, although the term "child", as used in the Longshoremen's and Harbor Workers' Compensation Act, includes "a child in relation to whom the deceased employee stood in loco parentis for at least one year prior to the time of injury, and a stepchild or acknowledged illegitimate child dependent upon the deceased", 33 U.S.C.A. § 902(14), no compensation is payable or customarily

awarded to a child under 18 under 33 U.S.C.A. § 909 for the death of a father where the widow is still living, but the compensation award to the widow is increased. Compensation is payable to children under 18 only where there is no widow or the widow dies after the award is made. In this case, 33 U.S.C.A. § 909 required that the compensation paid to the widow be increased from 35% of $105 per week to 65%—15% for each child—and the compensation order in this case found that "Dorothy Metzger as mother and natural guardian of the minor children is entitled to receive death benefits in their behalf of their maintenance and care at the rate of $31.50 per week [$15.75 each] until they shall have attained the age of 18", and awarded to the widow weekly payments of $68.25, being the full 65% of $105.

This Court concludes that neither Ronald nor Howard is entitled to share in any damages awarded in this case, but that the entire award should be made to the widow.

■ The recovery by the widow is governed by the rule frequently reiterated by the Court of Appeals of Maryland, that damages under the Maryland Act may be awarded for pecuniary losses which have already been sustained by the widow and which she will probably suffer in the future as a result of the death of her husband, but that no damages may be awarded as a solace for her grief or mental suffering. State, Use of Bowman v. Wooleyhan Transport Company, 192 Md. 686, 65 A.2d 321 (1949); Baltimore Transit Co. v. State, Use of Castranda, 194 Md. 421, 71 A.2d 442 (1949); United Railways & Electric Co. of Baltimore v. State, Use of Mantik, 127 Md. 197, 96 A. 261 (1915); Baltimore & Ohio R. Co. v. State, Use of Mahone, 63 Md. 135 (1885). See also State, Use of Gaegler v. Thomas, D.Md., 173 F.Supp. 568 (1959), and Jennings v. United States, D.Md., 178 F.Supp. 516 (1959), vacated and remanded on another point, 4 Cir., 291 F.2d 880 (1961).

Metzger's earnings during the last five years before his death averaged $5,644 per year. He customarily turned his pay checks over to his wife, who, after giving him the money he needed for his personal expenses, spent the rest for the needs of the entire family. Libelant argues that although Metzger may not have been legally bound to support Ronald and Howard, she, their mother, was legally bound to do so; that the support which Metzger in fact rendered the children relieved her of the need to work to support them; and that the loss of Metzger's contributions for the support of the children was therefore a pecuniary loss to her.

There is no Maryland case directly in point, but some guidance is offered by the opinion in Baltimore & Ohio R. Co. v. State, Use of Mahone, supra. There, the action was brought by a married daughter and two sons, all over the age of twenty-one years, for the death of their mother, who had made her permanent home with the daughter. The mother attended to the housework and looked after the daughter's children while the daughter was away at work. Those services on the part of the mother enabled the daughter to work out constantly and earn $6 per week. After her mother's death the daughter was not able to do outside work because she had no one to take care of the house and the children. The Court said: " * * * the services rendered by the mother in this case is the pecuniary benefit which the daughter had a right to expect from the continuance of her mother's life." 63 Md. at 146. The Court held that the value of such services was the measure by which the jury was to assess the damages, not what the daughter might earn by going out to work.

■ Would the Maryland court hold that the value of the support which Metzger furnished to libelant's children was a part of the pecuniary benefit which she had a right to expect from the continuance of his life? There is no way to be sure. A number of arguments leading to opposite conclusions come readily to mind and more are apparent upon reflection. I conclude that the Maryland

court would probably hold that the loss of the support which Metzger furnished to libelant's two children was a part of the pecuniary loss which she suffered as a result of his death.

Various factors which may affect earnings in the future were discussed by Judge Watkins in Jennings v. United States, supra. Some of the factors would tend to increase an award, some to decrease it. All are more or less speculative. The parties in this case have agreed, as is frequently done in this Court, and as this Court deems proper, that in view of the age and occupation of the decedent, all such factors should be disregarded, and Metzger's probable future earnings be considered the same as his earnings for a reasonable period before his death. The Court finds that his probable future contributions to his wife would also have been approximately the same over the years.

After considering the evidence which has been offered with respect to the family expenses and other evidence on the point, this Court finds that the pecuniary loss sustained by libelant as a result of Metzger's death was $3,669 a year. He was killed on September 24, 1962, i. e. 2 years 9½ months ago. Her loss to date is therefore 2–19/24 x $3,669, or $10,242.

Their joint life expectancy at the time of Metzger's death was 23.21 years, but his work life expectancy would not extend beyond the age of 65, especially in view of the heavy and wearing work of a longshoreman. He was born on February 11, 1915, and would therefore have become 65 years of age in 1980, fifteen years from the date of this judgment. The present value of $1 per year for 15 years is $11.12, assuming a 4% interest rate. Multiplying $3,669 x 11.12 gives $40,799, as the present value of libelant's future loss. The sum of $10,242 and $40,799 is $51,041, the amount for which judgment will be entered in favor of libelant.

Counsel will prepare an appropriate judgment order, stating the portion of the judgment which should be entered to the use of the employer's insurance carrier.

### Supplemental Opinion

 Liberty Mutual, the insurance carrier of Jarka, the employer of Metzger, has intervened in this case. It appears that Liberty also covers in the same policy the liability of Jarka to third parties for injuries to employees of Jarka arising out of stevedoring operations, as is now customary in the industry, and has agreed to indemnify and hold the shipowner harmless against any judgment, losses, damages or expenses arising out of this suit.

The Court finds and concludes that Liberty is entitled to receive or deduct from the amount of the judgment the full amount which it has paid to the widow under the compensation award as death benefits on her own behalf and on behalf of the children for their maintenance and care, and that Liberty will not be liable to pay future benefits to the widow, either for her own benefit or for the maintenance and care of the children, until the customary credit is exhausted.