Richard L. DRUMGOLD, Plaintiff,

v.

Splosna PLOVBA, Defendant.

Sam HYTER, Plaintiff,

v.

D. B. DENIZ NAKLIHATI T. A. S., Defendant.

Civ. A. Nos. 5298, 5307.

United States District Court
E. D. Virginia,
Norfolk Division.

Nov. 29, 1966.

984

Kelsey & Rabinowitz, Sidney H. Kelsey, Norfolk, Va., for plaintiffs.

Seawell, McCoy, Winston & Dalton, Virgil S. Gore, Jr., Norfolk, Va., for defendant Plovba.

Rixey & Rixey, William B. Eley, Norfolk, Va., for defendant D. B. Deniz Naklihati T. A. S.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

In all pertinent respects the factual situation and legal issues raised in these cases are substantially identical.

Drumgold, a longshoreman, was employed by Rogers Terminal and Shipping Corporation, a stevedore, 'when injured on October 21, 1965. At the time in question the stevedore was loading a cargo of grain aboard the defendant's vessel, BELA KRAJINA, at the docks of Cargill, Inc., in the City of Chesapeake pursuant to a contract between the stevedore and the shipowner. As a part of the stevedore's duty in loading the vessel and arranging for the stowage of grain, it was necessary to furnish, secure and place shifting boards in the ship's hold in order to prevent the grain from shifting while at sea. Plaintiff had been working aboard ship when he received orders from his employer (stevedore) to go ashore for the purpose of obtaining a specially rigged truck owned by the stevedore. He was instructed to load the truck with shifting boards and thereafter bring the truck onto the pier alongside the vessel in order that the boards could be placed aboard the vessel and used in the holds. Plaintiff, following these instructions, obtained two bundles of shifting boards, loaded same on the truck by means of the special rigging, brought the truck alongside the ship on the pier, and unloaded the shifting boards onto the pier. It was intended that the vessel's crane would lift the boards from the pier to the deck of the ship. Plaintiff was thereafter directed to use the truck's boom and hoist for the purpose of moving the shifting boards closer to the side of the vessel, thereby positioning the boards under the ship's crane. There is evidence tending to establish that the stevedore knew, or should have known, of the defective condition of the truck, its boom and standing legs. Plaintiff, in attempting to put down the truck's stabilizing legs and lift the load, found the legs defective and the truck capsized, falling into the water, as a result of which plaintiff was injured. The ship's crane was later used to raise the truck out of the water. The truck was regularly used by the stevedore in connection with loading operations but, of course, was operated on the pier and never taken aboard the vessel. There is some evidence to the effect that the ship's mate declined to allow the use of the ship's

crane and this fact necessitated the use of the truck, but this factor is not essential to this memorandum.

Hyter is a longshoreman and, on September 8, 1965, was employed by Atlantic & Gulf Stevedores, Inc.; the latter having contracted with the shipowner to perform unloading operations involving a cargo of cork from defendant's vessel, SS YOZGAT, while docked at Pier B, Northside, Norfolk, Virginia. Plaintiff had the job of slinger on the dock and, while engaged as such, plaintiff was struck by an allegedly defective forklift which was owned, operated and controlled by Atlantic & Gulf Stevedores, Inc. It is generally conceded that the operation of forklift machines on the pier or dock is a necessary adjunct to completing the unloading process of any cargo taken from a ship. There were 21 men in the stevedoring gang; 13 being aboard the vessel and 8 on the dock. The bales of cork are lifted out of the hold and then lowered to the dock where the hooks are unfastened by the slingers, following which the bales are placed upon towmotors or forklifts and taken away. Hyter, the plaintiff, had unhooked the hooks on a bale of cork when a towmotor, operated by a fellow longshoreman, backed up and ran over Hyter. While the condition of the brakes on the forklift is disputed, we will assume for the purpose of argument that the brakes were defective.

The respective plaintiffs contend that the warranty of seaworthiness must be extended to the truck in *Drumgold* and the towmotor in *Hyter*. They rely upon Spann v. Lauritzen, 3 Cir., 344 F.2d 204, cert. den. 382 U.S. 938, 86 S.Ct. 386, 15 L.Ed.2d 348; Huff v. Matson Navigation Co., 9 Cir., 338 F.2d 205, cert. den. 380 U.S. 943, 85 S.Ct. 1026, 13 L.Ed.2d 963, and Metzger v. SS Kirsten Torm, D.C. Md., 245 F.Supp. 227. They point also to the celebrated cases of Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297, and Italia Societa etc. v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732. Espe-

cially, plaintiffs say, is the significance of footnote 3 from *Italia* where it says in part:

> "If the owner engages others who supply the equipment necessary for stevedoring operations, he must still answer to the longshoreman if the gear proves to be unseaworthy."

Taking the foregoing statement at its face value, without more, it encompasses every phase of a stevedoring operation from office management to actual loading or unloading, irrespective of the type of equipment used and without regard to the manner and place of injury. Stated otherwise, if equipment is directly or indirectly used as a necessary adjunct to a stevedoring operation as a business enterprise, then, plaintiffs argue, the warranty of seaworthiness applies.

In *Huff*, the longshoreman was injured in the hold of the ship because of a defect in a conveyor system which was attached to a gantry crane running on rails along the pier. Thus the conveyor system, while attached to a shoreside piece of equipment, was actually brought aboard or into the vessel and constitutes a reasonable extension of the rule pronounced in Alaska S.S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798.

In *Spann*, the longshoreman was engaged in unloading a hopper which stood on a pier but was not attached to the vessel. A shore-based crane would lower a bucket into the hold, pick up a load of nitrate, swing it around, and drop it into a hopper on the pier. Empty trucks would move under the hopper and the plaintiff-longshoreman would then open the door of the hopper to permit the nitrate to dump into the waiting truck. The longshoreman was injured because of a defective release mechanism on the hopper, thereby causing a sudden premature downward movement of the hopper handle.

The doctrine of seaworthiness has been applied to a longshoreman injured on the dock due to the defective operation of a

ship's winch in unloading operations in American Export Lines, Inc. v. Revel, 4 Cir., 266 F.2d 82, decided in 1959, prior to the decisions from Third and Ninth Circuits in *Spann* and *Huff* respectively, and several years before Gutierrez and Italia Societa.

There is a definite conflict in Circuits occasioned by other opinions from the Second and Sixth Circuits. In Forkin v. Furness Withy & Co., 2 Cir., 323 F.2d 638, Circuit Judge Friendly suggests cogent reasons why there is no warranty of seaworthiness owed to a longshoreman injured while engaged in attempting to make fast a conveyor being raised to a ship. And in McKnight v. N. M. Paterson & Sons, Ltd., N.D.Ohio, 181 F.Supp. 434, affirmed 6 Cir., 286 F.2d 250, cert. den. 368 U.S. 913, 82 S.Ct. 189, 7 L.Ed.2d 130, a recovery was denied on summary judgment where the longshoreman, while working in the hold of the vessel, was struck by a part of the unloading gear being lowered into the ship's hold by means of a shore-based crane owned and operated by the stevedore. The *Forkin* opinion considers and distinguishes *Gutierrez*, the 1963 decision of the United States Supreme Court.

In 1955 the case of Fredericks v. American Export Lines, 2 Cir., 227 F.2d 450, cert. den. 350 U.S. 989, 76 S.Ct. 475, 100 L.Ed. 855 was decided and is, factually speaking, closest in point to the situation here presented. There the longshoreman was injured when a skid, located on a pier and used in the unloading of cargo, failed. The argument was advanced that the cargo could not be safely transferred from aboard ship to the upper story of the pier without the use of a skid. As Circuit Judge Medina said on this subject:

"But tools or equipment do not become part of a lessee's plant merely because such tools or equipment are indispensable to the work that an independent contractor has agreed to perform. * * *

" * * * (H)ere the injury was incurred by a longshoreman standing on a pier, as a result of the failure of a defective appliance located on the pier and furnished by a subcontractor. No decision so far has extended the sweeping protection of the seaworthiness doctrine to this situation. No vessel was connected with the accident."

On the subject as to whether any "vessel was connected with the accident", it should be noted that the longshoreman was engaged in assisting in the transfer of cargo from a ship to the upper story of the pier.

More recently, Deffes v. Federal Barge Lines, Inc., 5 Cir., 361 F.2d 422, cert. pending, has been added to the list approving *Huff* and *Spann*, and rejecting *McKnight* and *Forkin*.

The plaintiffs in these cases are urging a further expansion of the *Huff*, *Spann*, and *Deffes* doctrine. They urge, and not without merit, that if the longshoreman is in any manner engaged "in the service of the ship", the warranty of seaworthiness applies if such service is anywise connected with the contemplated loading or the contemplated removal from the pier apron of cargo already on the pier for the purpose of stowage in a warehouse or for any other transfer purpose.

Assuming without deciding the correctness of the rulings in *Huff*, *Spann*, and *Deffes*, this Court is not of the opinion that the seaworthiness doctrine can be so extended. For example, the longshoreman may be technically in the service of the ship if he is instructed to take a truck for the purpose of going into the city to secure a rope or wire necessary in connection with the loading or unloading operations of a particular vessel. While so engaged the brakes on the truck become defective and, at a point many miles from the vessel, the longshoreman is injured by reason of an accident. Plaintiffs argue that the truck's defective brakes would render the vessel unseaworthy. In effect, what plaintiffs wish to do is to extend to the injured longshoreman all of the benefits accruing to the injured seaman under the Jones Act.

See: Hopson v. Texaco, Inc., 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740.[1]

In *Gutierrez* the injury to the longshoreman was sustained when he slipped on loose beans spilled on the dock occasioned by an unseaworthy condition of the cargo while aboard the vessel, with a resultant spillage during unloading operations. We agree that *Gutierrez* clearly extends the seaworthiness doctrine to longshoremen "loading or unloading" a ship, whether aboard the ship or on the pier. We do not, however, find that the loading operation in *Drumgold* had commenced—and we further find that the unloading operation in Hyter had terminated—when the respective longshoremen were injured. Manifestly the items of equipment giving rise to the injuries were never intended to be used aboard ship; they were, at best, mere conveyors to bring equipment needed to the ship's side (*Drumgold*), or to remove already unloaded cargo to another area (*Hyter*). We find no authority which would cause us to hold that every piece of equipment and every activity leading up to or following the loading or unloading operation must be covered under the warranty of seaworthiness. We are concerned with the ship and the ship's equipment attendant to the *ship's duty to load and unload*. If such assumption is incorrect we will be constantly confronted with claims alleging unseaworthiness of a vessel because of cargo, about to be loaded aboard ship, which falls in a warehouse on the pier thereby injuring an employee of the stevedoring concern. In *Drumgold* we do not believe that the loading operation, insofar as the warranty of seaworthiness is concerned, commenced until the shifting boards were in the process of being physically moved from the stevedore's truck to the deck. In *Hyter* [2] we feel that the unloading terminated, insofar as the warranty of seaworthiness is concerned, when the bale of cork in a seaworthy con-

dition was properly detached by the slingers and was at rest on the pier awaiting removal to another area. It was at these points that the warranty of seaworthiness started and stopped. Such a holding does no violence to *Gutierrez, Huff, Spann, Deffes,* and *Metzger,* all relied upon by the plaintiffs. It merely places a reasonable limitation upon the extent of the seaworthiness warranty.

Whatever has been said herein does not constitute any expression of opinion as to negligence, if the plaintiffs determine that any such basis of recovery exists.

---

1. But Hopson v. Texaco, Inc., supra, does not purport to say anything with respect to the warranty of seaworthiness. The injured and deceased seamen were undoubtedly "in the service of the vessel" when involved in the taxi accident.

2. *Hyter* was argued together with *Drumgold*. Counsel in *Hyter* were instructed to prepare a stipulation of facts which apparently has not been done. If the facts in *Hyter* are incorrectly stated, the Court should be so advised.