**Bill LAW, Plaintiff-Appellant,**

v.

**VICTORY CARRIERS, INC., etc., and the S.S. SAGAMORE HILL, etc., Defendants-Third Party Plaintiffs-Appellees,**

v.

**GULF STEVEDORE CORP., Third-Party Defendant-Appellee.**

No. 28451.

United States Court of Appeals, Fifth Circuit.

Sept. 16, 1970.

Rehearing Denied and Rehearing En Banc Denied Nov. 3, 1970.

Francis M. Thigpen, Diamond & Lattof, Ross Diamond, Jr., Mobile, Ala., for plaintiff-appellant.

George F. Wood, Mobile, Ala., for Victory Carriers, Inc.

W. Boyd Reeves, Mobile, Ala., for Gulf Stevedore Corp.

Before COLEMAN, GOLDBERG and MORGAN, Circuit Judges.

GOLDBERG, Circuit Judge:

In this admiralty case we must decide whether the post-*Gutierrez* [1] doctrine of unseaworthiness is sufficiently expansive to embrace a longshoreman moving cargo from a point on the dock toward the vessel as part of the total operation of loading the vessel. The longshoreman, plaintiff-appellant Bill Law, was injured on December 11, 1967, while working as part of a stevedore gang engaged in the loading of the SS SAGAMORE HILL. The SAGAMORE HILL, a vessel owned and operated by Victory Carriers, Inc. (Victory), was docked at the Port of Mobile, Alabama. Law's employer, Gulf Stevedore Corporation (Gulf), was in charge of the loading operation.

The record indicates that plaintiff Law had worked as a longshoreman for ten or twelve years prior to the accident. The exact situs and specific function of his work varied. On some days he drove a forklift machine on board a vessel; on some days he worked on the dock as a "hook up" man; and on some days he drove a forklift machine on the dock. On the day of his accident he was driving a forklift machine—one owned by his employer, Gulf—on the dock. He was using a forklift to carry cargo to the hook-up point on the dock alongside

1. Gutierrez v. Waterman S. S. Corp., 1963, 374 U.S. 858, 83 S.Ct. 1863, 10 L.Ed.2d 1082.

the vessel. The cargo consisted of bundles of metal-mesh aircraft landing mats. Law would pick up a bundle from a pile on the dock—the pile was located approximately 50 feet from the vessel—and take it to the hook-up point alongside the ship. The mats were not taken directly onto the vessel from the forklift machine. Instead, Law would set them down on the dock at the hook-up point, and they would subsequently be taken aboard the vessel by other longshoremen by use of the vessel's gear and equipment.

While Law was transporting one of the bundles of mats from the pile to the hook-up point, the overhead protection rack of the forklift machine came loose and fell on him, allegedly causing the injuries of which he now complains. The overhead protection rack, commonly called the "headache rack," is a metal frame positioned above the driver's seat to protect him from falling objects. Law's investigation after the accident allegedly revealed that the four bolts which should have secured the rack were missing.

Law filed a complaint in the district court alleging that his injuries were caused by the unseaworthiness of the SAGAMORE HILL and the negligence of Victory. The shipowner subsequently filed a third-party complaint against Gulf, seeking indemnity if Victory should be held liable to Law. After discovery both Victory and Gulf filed motions for summary judgment, to which Law responded by filing a cross-motion for summary judgment.

In ruling on the motions the district court considered only one issue—whether the warranty of seaworthiness extended to plaintiff Law.[2] The court concluded that Law was not "loading" the ship, that he therefore was not engaged in the service of the ship, and hence that he was not within the scope of the warranty of seaworthiness. Having thus concluded that the doctrine of unseaworthiness was not applicable to this case, the court granted the motions of Victory and Gulf and denied the motion of Law.

Law now appeals, contending that the court below erred in holding that he was not within the scope of the warranty of seaworthiness. Agreeing with Law's contention, we reverse and remand.

The doctrine of unseaworthiness has been correctly called "a child of twentieth-century federal jurisprudence."[3] Brought to life by Mr. Justice Brown's famous dictum in The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760,[4] divorced from concepts of negligence in Mahnich v. Southern Steamship Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, and nurtured in the bosom of a largely sympathetic judiciary ever since, the doctrine has experienced unremitting growth and expansion.[5] As Judge Coleman recently wrote for this court, "[t]he doctrine is a growing concept, constantly undergoing redefinition `as the risks of those protected are enlarged by changing technology and ship board technique." Dillon v. M. S. Oriental Inventor, 5 Cir.1970, 426 F.2d 977, 979.

2. The court did not pass on the question of whether or not the forklift machine was in fact defective.

3. Note, The Doctrine of Unseaworthiness in the Lower Federal Courts, 76 Harv. L.Rev. 819 (1963).

4. The second of Mr. Justice Brown's four propositions in his opinion for the Court was the following: "That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship." 189 U.S. at 175, 23 S.Ct. at 487.

5. We find it unnecessary for purposes of this opinion to delineate a comprehensive historical overview of the development of the doctrine of unseaworthiness. We note, however, that this task has been undertaken with admirable results by some commentators and text writers. For example, excellent historical analyses can be found in Gilmore and Black, The Law of Admiralty, Chapter VI (1957), and Tetreault, Seamen, Seaworthiness and the Rights of Harbor Workers, 39 Cornell. L.Q. 381 (1954).

Two Supreme Court decisions have particular relevance to the case at bar. The first is Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. In *Sieracki* the Supreme Court considered the question whether "the obligation of seaworthiness, traditionally owed by an owner of a ship to seamen," 378 U.S. at 87, 66 S.Ct. at 874, "extends to longshoremen injured while doing the ship's work aboard [the ship] but employed by an independent stevedoring contractor whom the owner has hired to load or unload the ship," *id.* at 89, 66 S.Ct. at 875. The Court answered this question in the affirmative, holding that a longshoreman injured on board a vessel could pursue his remedy for unseaworthiness against the shipowner as well as his remedy against his employer under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq. The Court's rationale for extending the warranty of seaworthiness to longshoremen injured on board a vessel was that a worker "doing a seaman's work and incurring the seaman's hazards," *id.* at 99, 66 S.Ct. at 880, should be entitled to the seaman's protections "regardless of the fact that he is employed immediately by another than the owner," *id.* at 99, 66 S.Ct. at 880.

> "Historically the work of loading and unloading is the work of the ship's service, performed until recent times by members of the crew. [Citing cases]. That the owner seeks to have it done with the advantages of more modern divisions of labor does not minimize the worker's hazard and should not nullify his protection." *Id.* at 96, 66 S.Ct. at 878.

Accordingly, the Court concluded that "when a man is performing the function essential to maritime service on board a ship the fortuitous circumstances of his employment by the shipowner or a stevedoring contractor should not determine the measure of his rights." *Id.* at 97, 66 S.Ct. at 878.

The Court's subsequent decision in Gutierrez v. Waterman Steamship Corp., 1963, 374 U.S. 858, 83 S.Ct. 1863, 10 L. Ed.2d 1082, further extended the applicability of the doctrine of unseaworthiness to longshoremen, for the Court in *Gutierrez* made it clear that the doctrine has relevance to injuries sustained off the vessel. The injured longshoreman in *Gutierrez* slipped on the dock on beans which had spilled out of defective bags during the unloading of a cargo of beans from the vessel. On these facts the Court concluded that the longshoreman was within the scope of the warranty of seaworthiness, holding that "the duty to provide a seaworthy ship and gear, including cargo containers, *applies to longshoremen unloading the ship whether they are standing aboard ship or on the pier."* 373 U.S. at 215, 83 S.Ct. at 1191, 10 L.Ed.2d 297 (emphasis added). The rationale implicit in this holding is a logical extension of *Sieracki:* since a longshoreman loading or unloading a vessel is doing a seaman's work and incurring a seaman's hazards, he should be entitled to the seaman's protections regardless of the fact that he is a few feet landward of the water line.

▪ Although *Sieracki* and *Gutierrez* are the major constellations by which we steer our course in the present case, we must also be aware of several other developments in the law of admiralty which bear upon the ultimate disposition of this case. First, it is well established that the shipowner's warranty of seaworthiness extends to equipment supplied by the stevedore. Alaska Steamship Co. v. Petterson, 1954, 347 U. S. 396, 74 S.Ct. 601, 98 L.Ed. 798, affirming per curiam 9 Cir. 1953, 205 F. 2d 478; Rogers v. United States Lines, 1954, 347 U.S. 984, 74 S.Ct. 849, 98 L. Ed. 1120, reversing per curiam 3 Cir. 1953, 205 F.2d 57; see Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 1964, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732. In the present case, therefore, the shipowner cannot be exonerated from liability by the mere fact that the forklift machine was owned by the stevedore rather than by the

shipowner. Secondly—and this second principle ameliorates the apparent harshness of the principle just discussed—a shipowner held liable to a longshoreman for unseaworthiness may bring a third-party action against the stevedore for indemnity if the longshoreman's injury was occasioned by a breach of the stevedore's warranty (to the shipowner) of workmanlike performance. Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. It is under this theory that Victory seeks indemnity from Gulf in the present case.[6] Finally, we note that this circuit has specifically rejected the arguments (1) that the doctrine of unseaworthiness applies only to equipment which is part of the traditional gear of a ship and (2) that the doctrine applies only to equipment which is attached to or touching the ship. These arguments were laid to rest in Judge Thornberry's scholarly and well-reasoned opinion in Deffes v. Federal Barge Lines, Inc., 5 Cir. 1966, 361 F.2d 422, cert. denied, Continental Grain Co. v. Deffes, 385 U.S. 969, 87 S.Ct. 503, 17 L. Ed.2d 433. Thus the application of the doctrine in the present case cannot be defeated (1) by the fact that the equipment here involved—a forklift machine —is a product of modern technology or (2) by the fact that the forklift was not physically attached to or touching the ship.

With these relevant concepts furnishing a backdrop, we turn to the fundamental question before us: Was Bill Law engaged in *loading* the SAGA-MORE HILL when he sustained his injuries on December 11, 1967? Our answer to this question will determine whether he was within the scope of the warranty of seaworthiness.

In assaying this question, we find in the reported cases two distinct approaches to the problem. One approach —the minority view—is to define "loading" in an exceedingly narrow and mechanical fashion, limiting it to those activities which begin with the physical act of lifting the cargo onto the vessel. Illustrative of this approach is Drumgold v. Plovba, E.D.Va.1966, 260 F.Supp. 983. The opinion in *Drumgold* disposed of two separate actions, one by a longshoreman (*Drumgold*) who contended that he had been injured while *loading* a vessel, the other by a longshoreman (*Hyter*) who contended that he had been injured while *unloading* a vessel. The court rejected both contentions. To convey the full flavor of the court's opinion, we quote *in extenso* therefrom:

"Drumgold, a longshoreman, was employed by Rogers Terminal and Shipping Corporation, a stevedore, when injured on October 21, 1965. At the time in question the stevedore was loading a cargo of grain aboard the defendant's vessel, BELA KRAJINA, at the docks of Cargill, Inc., in the City of Chesapeake pursuant to a contract between the stevedore and the shipowner. As a part of the stevedore's duty in loading the vessel and arranging for the stowage of grain, it was necessary to furnish, secure and place shifting boards in the ship's hold in order to prevent the grain from shifting while at sea. Plaintiff had been working aboard ship when he received orders from his employer (stevedore) to go ashore for the purpose

6. One significant result of the *Ryan* indemnity doctrine in cases involving land-based injuries was noted recently by the Ninth Circuit in Gebhard v. S. S. Hawaiian Legislator, 9 Cir. 1970, 425 F.2d 1303, 1312:

"Although the landward extension of unseaworthiness has been criticized (*e. g.*, Skibinski v. Waterman S. S. Corp. (2d Cir. 1966) 360 F.2d 539, 543 (Judge Friendly dissenting), cert. denied (1967) 387 U.S. 921, 87 S.Ct. 2027, 18 L.Ed.2d 975), the overall result has not been unfortunate. Liability is generally shifted back to the stevedoring company through indemnity suits, and that company then has an incentive to improve its loading and unloading equipment. (*See* Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co. (1964) 376 U.S. 315, 324, 84 S.Ct. 748, 11 L.Ed.2d 732; Proudfoot, " 'The Tar Baby': Maritime Personal Injury Indemnity Actions" (1968) 20 Stan.L.Rev. 423, 445–46.)"

of obtaining a specially rigged truck owned by the stevedore. He was instructed to load the truck with shifting boards and thereafter bring the truck onto the pier alongside the vessel in order that the boards could be placed aboard the vessel and used in the holds. Plaintiff, following these instructions, obtained two bundles of shifting boards, loaded same on the truck by means of the special rigging, brought the truck alongside the ship on the pier, and unloaded the shifting boards onto the pier. It was intended that the vessel's crane would lift the boards from the pier to the deck of the ship. Plaintiff was thereafter directed to use the truck's boom and hoist for the purpose of moving the shifting boards closer to the side of the vessel, thereby positioning the boards under the ship's crane. There is evidence tending to establish that the stevedore knew, or should have known, of the defective condition of the truck, its boom and standing legs. Plaintiff, in attempting to put down the truck's stabilizing legs and lift the load, found the legs defective and the truck capsized, falling into the water, as a result of which plaintiff was injured. The ship's crane was later used to raise the truck out of the water. The truck was regularly used by the stevedore in connection with loading operations but, of course, was operated on the pier and never taken aboard a vessel. There is some evidence to the effect that the ship's mate declined to allow the use of the ship's crane and this fact necessitated the use of the truck, but this factor is not essential to this memorandum.

"Hyter is a longshoreman and, on September 8, 1965, was employed by Atlantic & Gulf Stevedores, Inc.; the latter having contracted with the shipowner to perform unloading operations involving a cargo of cork from defendant's vessel, SS YOZGAT, while docked at Pier B, Northside, Norfolk, Virginia. Plaintiff had the job of slinger on the dock and, while engaged as such, plaintiff was struck by an allegedly defective forklift which was owned, operated and controlled by Atlantic & Gulf Stevedores, Inc. It is generally conceded that the operation of forklift machines on the pier or dock is a necessary adjunct to completing the unloading process of any cargo taken from a ship. There were 21 men in the stevedoring gang; 13 being aboard the vessel and 8 on the dock. The bales of cork are lifted out of the hold and then lowered to the dock where the hooks are unfastened by the slingers, following which the bales are placed upon towmotors or forklifts and taken away. Hyter, the plaintiff, had unhooked the hooks on the bale of cork when a towmotor, operated by a fellow longshoreman, backed up and ran over Hyter. While the condition of the brakes on the forklift is disputed, we will assume for the purpose of argument that the brakes were defective.

"The respective plaintiffs contend that the warranty of seaworthiness must be extended to the truck in *Drumgold* and the towmotor in *Hyter*. They rely upon Spann v. Lauritzen, 3 Cir., 344 F. 2d 204, cert. den. 382 U.S. 938, 86 S.Ct. 386, 15 L.Ed.2d 348; Huff v. Matson Navigation Co., 9 Cir., 338 F.2d 205, cert. den. 380 U.S. 943, 85 S.Ct. 1026, 13 L.Ed.2d 963; Deffes v. Federal Barge Lines, Inc., 5 Cir., 361 F.2d 422, cert. den. Continental Grain Co. v. Deffes, 385 U.S. 969, 87 S.Ct. 503, 504, 17 L.Ed.2d 433, and Metzger v. SS Kirsten Torm, D.C.Md., 245 F.Supp. 227. They point also to the celebrated cases of Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297, and Italia Societa etc. v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732.

\* \* \* \* \* \*

"\* \* \* They urge, and not without merit, that if the longshoreman is in any manner engaged 'in the service of the ship', the warranty of seaworthiness applies if such service is anywise connected with the contemplated loading or the contemplated removal from the pier apron of cargo already on the pier for the purpose of stowage in a warehouse or for any other transfer purpose.

"Assuming without deciding the correctness of the rulings in *Huff, Spann,* and *Deffes,* this Court is not of the opinion that the seaworthiness doctrine can be so extended. For example, the longshoreman may be technically in the service of the ship if he is instructed to take a truck for the purpose of going into the city to secure a rope or wire necessary in connection with the loading or unloading operations of a particular vessel. While so engaged the brakes on the truck become defective and, at a point many miles from the vessel, the longshoreman is injured by reason of an accident. Plaintiffs argue that the truck's defective brakes would render the vessel unseaworthy. In effect, what plaintiffs wish to do is to extend to the injured longshoreman all of the benefits accruing to the injured seaman under the Jones Act. See: Hopson v. Texaco, Inc., 383 U.S. 262, 86 S.Ct. 765, 15 L. Ed.2d 740.

"In *Gutierrez* the injury to the longshoreman was sustained when he slipped on loose beans spilled on the dock occasioned by the unseaworthy condition of the cargo while aboard the vessel, with a resultant spillage during unloading operations. We agree that *Gutierrez* clearly extends the seaworthiness doctrine to longshoreman 'loading or unloading' a ship, whether aboard the ship or on the pier. We do not, however, find that the loading operation in *Drumgold* had commenced—and we further find that the unloading operation in Hyter had terminated—when the respective longshoremen were injured. Manifestly the items of equipment giving rise to the injuries were never intended to be used aboard ship; they were, at best, mere conveyors to bring equipment needed to the ship's side (*Drumgold*), or to remove already unloaded cargo to another area (*Hyter*). We find no authority which would cause us to hold that every piece of equipment and every activity leading up to or following the loading or unloading operation must be covered under the warranty of seaworthiness. We are concerned with the ship and the ship's equipment

attendant to the *ship's duty to load and unload.* If such assumption is incorrect we will be constantly confronted with claims alleging unseaworthiness of a vessel because of cargo, about to be loaded aboard ship, which falls in a warehouse on the pier thereby injuring an employee of the stevedoring concern. In *Drumgold* we do not believe that the loading operation, insofar, as the warranty of seaworthiness is concerned, commenced until the shifting boards were in the process of being physically moved from the stevedore's truck to the deck. In *Hyter* we feel that the unloading terminated, insofar as the warranty of seaworthiness is concerned, when the bale of cork in a seaworthy condition was properly detached by the slingers and was at rest on the pier awaiting removal to another area. It was at these points that the warranty of seaworthiness started and stopped. Such a holding does no violence to *Gutierrez, Huff, Spann, Deffes,* and *Metzger,* all relied upon by the plaintiffs. It merely places a reasonable limitation upon the extent of seaworthiness warranty." 260 F. Supp. at 984–985, 986–987 (footnotes omitted).

In the case *sub judice* the district court embraced the narrow definition of "loading." The final order entered by the court below included the following language:

"[T]he question presented to the Court for decision is whether a longshoreman removing cargo from storage to dockside by operating a forklift machine is performing ship's work and therefore entitled to a seaworthy vessel. After careful consideration of the facts and the applicable law, the Court concludes that the plaintiff, Bill Law, was not engaged in work for the service of the ship and not covered by the warranty of seaworthiness.

"The Court's conclusion is based on the 'status' of plaintiff's work and not his situs at the time of the injury. Plaintiff was positioning cargo on the dock which in turn would be loaded onto the vessel. The cargo was not

directly loaded from the plaintiff's forklift nor did the plaintiff assist in the loading of the cargo into the hold of the vessel. In the simplest sense, all plaintiff was doing was bringing cargo to the dock to be loaded on the vessel. Would a truck driver who drives to the dock in his truck and unloads freight which in turn will become cargo for a vessel be entitled to a seaworthy vessel? Would his truck be an appurtenance to the ship? The Court thinks not. True, the plaintiff's association with the vessel and to the loading operation of the cargo is closer than the hypothetical presented above, but to extend the seaworthiness doctrine to the plaintiff's work would also extend the doctrine to an unlimited number of situations for which it was never intended. The plaintiff was not engaged in the *actual* loading of the vessel at the time of the accident. It is easy to say that he was assisting or contributing in the loading of the cargo aboard the vessel. But the same rationale can apply to innumerable persons who perform work which is necessary or required to 'service' the ship for sea duty. The liability of the ship is not unlimited. A line must be drawn. As stated in Daniel v. Skibs A/S Hilda Knudsen, 253 F.Supp. 758, affirmed 368 F.2d 178 (3rd C.A. 1966):

'While plaintiff's work may have contributed to the unloading process in a philosophical sense, it was not unloading in the sense that it was a part of the ship's work. We are aware that the recent trend of decisions in this Circuit and in the Supreme Court has been to widen the ambit of seaworthiness coverage. However, there has to be an end somewhere of the unloading process in the sense of liability imposing ship's work.'

"The above statement certainly applies to the loading process as well as the unloading of the ship; just as there must be an end to the unloading, there must be a beginning for the loading operation. In the immediate case, the plaintiff was not loading cargo aboard the vessel in the sense of 'ship's work' and his theory of recovery against the defendant for unseaworthiness must fail."

It is thus apparent that the district court concluded that Law was not "loading" the SAGAMORE HILL because his job—moving the aircraft landing mats to the hook-up point adjacent to the vessel—entailed activities which preceded the actual physical act of lifting the cargo onto the vessel.

The more prevalent view, however, is found in cases which define the terms "loading" and "unloading" in a more pragmatic and less ritualistic sense. Illustrative of these cases is Byrd v. American Export Isbrandtsen Lines, Inc., E.D.Pa.1969, 300 F.Supp. 1207. Like the case now before us, *Byrd* involved an injury to a longshoreman engaged in moving cargo by means of a forklift machine from one point on the dock to another point nearer the vessel. The court held that the longshoreman was involved in the operation of loading the vessel at the time of his injury. We quote the court's opinion:

"This is a motion for summary judgment filed by the defendant shipowner in this action by a longshoreman. Defendant contends that the plaintiff's deposition conclusively establishes that the plaintiff's accident could have been occasioned only by either of two possible causes and that defendant was not responsible for either cause.

"Plaintiff's deposition discloses that he and Otis Givens, another longshoreman, were engaged in an attempt to move from the back to the front of the pier, a forklift truck, which was intended to be loaded aboard defendant's vessel as cargo. The attempt was undertaken by backing up another forklift truck, identified as No. 947, to the prospective cargo, so that the latter could be towed forward. As plaintiff bent down between the two trucks to attach a tow rope, No. 947

backed up, catching plaintiff between the two. Plaintiff does not know where Otis Givens was at the time plaintiff was injured, but says he last observed Givens getting off No. 947 before the accident. No ship's gear was attached to No. 947, which was owned by Atlantic & Gulf Stevedores, Inc.

"Defendant asserts that even if No. 947 was backed into plaintiff by Givens or rolled into the plaintiff because of some defective condition, the defendant cannot be held liable, because the activity in which the plaintiff was then engaged on the pier was, not yet the loading operation of the ship.

"Defendant concedes, as it must, that it is immaterial whether the accident occurred on the pier away from the ship, *if the longshoreman was actually engaged in the service of the ship*, which includes the loading operation. Gutierrez v. Waterman Steamship Corporation, 373 U.S. 206, 83 S. Ct. 1185, 10 L.Ed.2d 297 (1963); Hagans v. Ellerman & Bucknall Steamship Co., 318 F.2d 563 (3 Cir.1963).

"We believe that defendant unduly delimits the term 'loading' to the actual transfer of the cargo from the front of the pier to the vessel. The backing of No. 947 to the intended cargo and the endeavor to attach the tow rope between the vehicles were concomitant and essential steps in the loading operation.

"As this Court has stated in a similar situation in which the defendant claimed that plaintiff was merely *preparing* the cargo for loading, when he was injured while placing 'chocks' under a draft of steel beams prior to their being hoisted aboard the vessel:

'The term loading is not a word of art, and is not to be narrowly and hypertechnically interpreted. Plaintiffs' actions at the time of the accident were direct, necessary steps in the physical transfer of the steel from the railroad car into the vessel which constituted the work of loading.' Litwinowicz v. Weyerhaeuser Steamship Co., 179 F.Supp. 812, 817–818 (E.D.Pa.1959).

"Since we conclude that plaintiff was essentially engaged in a loading operation and was using equipment necessary for that purpose, which was at least temporarily adopted by the ship, the defendant's motion must be denied." 300 F.Supp. at 1208 (footnote omitted).

For other holdings in a similar vein, see, e.g., Gebhard v. S. S. Hawaiian Legislator, 9 Cir. 1970, 425 F.2d 1303; Thompson v. Calmar Steamship Corp., 3 Cir. 1964, 331 F.2d 657, cert. denied, 379 U. S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184; Hagans v. Ellerman & Bucknall Steamship Co., 3 Cir. 1963, 318 F.2d 563; cf. Olvera v. Michalos, S.D.Tex.1968, 307 F.Supp. 9.

We choose to align ourselves with the cases which define "loading" and "unloading" in a realistic sense rather than as hypertechnical terms of art. It seems to us that plaintiff Law was clearly engaged in "loading" the SAGAMORE HILL under any conventional interpretation of that term. He was part of a group of longshoremen who were engaged in the total operation of moving cargo from the dock to the vessel. Some of the longshoremen involved in the operation were on board the vessel, while others were on the dock. The efforts of both the ship-side workers and the shore-side workers were necessary to load the ship. We think it would be incongruous and capricious to deny the protection of the warranty of seaworthiness to plaintiff Law while granting it to his fellow longshoremen whose duties happened to involve activities on the vessel or the actual physical act of lifting the cargo onto the ship. To deny him the benefits of the doctrine of unseaworthiness under these circumstances would be to reject the humanitarian policy which underlies the doctrine. Law was subjected to the risks

and hazards of loading the ship;[7] he should likewise receive the protections afforded those who load ships.

In so holding, of course, we decide only the case before us and do not attempt to anticipate the cases which may arise in the future. For example, we do not take the position—asserted unsuccessfully by the plaintiffs in Drumgold v. Plovba, *supra*—that a longshoreman who is instructed to drive a truck many miles inland on a mission for his employer is necessarily within the scope of the warranty of seaworthiness. If such a case is to arise in the future, it should be decided then, not now.

We do not have here an accident occurring in some urban enclave or pastoral pasture far removed from the pier. On the contrary, Law's activities had proximity to and continuity with the job at hand—the task of loading cargo aboard the SAGAMORE HILL. His specific job performance was so integrally woven into the entire loading operation that the two cannot be separated except by the erection of hypertechnical and unrealistic legal barriers. If the terms "loading" and "unloading" are to be terms associated with reality rather than mere conceptual microcosms without adjuncts beyond the ship's beam, we have no choice but to conclude that plaintiff Law was engaged in loading the SAGAMORE HILL. We therefore hold that on the facts of this case—a longshoreman, intimately involved in the process of loading a vessel, injured as he moved cargo from the back to the front of the dock—plaintiff was within the scope of the warranty of seaworthiness.

Since we have concluded that the doctrine of unseaworthiness is here applicable, plaintiff must be afforded the opportunity to prove the truth of his allegations. We therefore remand the case to the district court for further proceedings consistent with this opinion.

Reversed and remanded.

---

7. For an enlightening discussion of the risks incurred by longshoremen, see Note,

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 33 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied

Risk Distribution and Seaworthiness, 75 Yale L.J. 1174 (1966).